IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ADLER MEDICAL, LLC, et. al,

    Plaintiffs,

v.        Case No. 1:22-cv-00072-KG-LF

MAUREEN HARRINGTON,

    Defendant/Counterclaim Plaintiff
    Third Party Plaintiff.

DEPOSITION OF MAUREEN HARRINGTON
Volume 1
October 19, 2023
9:04 a.m.
201 Third Street, Northwest, Suite 1630
Albuquerque, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: JEFFREY L. SQUIRES
    Attorney for the Plaintiffs

REPORTED BY: Robin A. Brazil, RPR, NM CCR #154
    Bean & Associates, Inc.
    Professional Court Reporting Service
    201 Third Street, Northwest, Suite 1630
    Albuquerque, New Mexico 87102

(8647N) RAB

Page 26

```
 1  professional, and it depended on, you know, what
 2  people were interested in the photographs were, a
 3  cover or whatever.
 4      Q.  Okay.
 5      A.  It all varied. I knew that much, but --
 6      Q.  To your knowledge, did his work as a
 7  photographer change much during the past five years?
 8      A.  Yes.
 9      Q.  How did it change?
10      A.  Well, he -- he used to be in stock
11  photography, you know, the banks, like Getty and
12  Alamy and Corbis, and so he got out of that because
13  he was making, like, $5 a photo, and he felt like,
14  you know, it was kind of demeaning, you know.
15      Q.  And he told you this?
16      A.  Yeah. Yeah, because, you know, like
17  camera equipment and all this stuff, he spent, you
18  know -- he spent thousands and thousands of dollars
19  on his equipment, whereas some people now, you know,
20  they take a photo with their iPhones. Well, you
21  know, much more went into his work than I think
22  people give him credit for.
23      Q.  You mentioned a couple of names of
24  companies, Corbis and Alamy, Getty. Were you aware
25  of those companies and what they did prior to the
```

Page 27

```
 1  litigation in which I'm involved here?
 2      A.  Yeah, just that they had his -- like if a
 3  client was looking for a photo, they might, you
 4  know, research and get it through them, so yeah.
 5      Q.  And how did you know that?
 6      A.  He told me.
 7      Q.  At the time?
 8      A.  Yeah, like -- yeah, over the years.
 9      Q.  Do you have any specific knowledge of the
10  value of photographs that he took?
11      A.  No.
12      Q.  Were you aware of the lawyers with whom he
13  dealt in connection with his litigation activities?
14      A.  The names?
15      Q.  The names.
16      A.  Yeah, like Dan --
17      Q.  Other than --
18      A.  -- and David Deal.
19      Q.  -- David Deal, any other names that you
20  remember?
21      A.  No.
22      Q.  You have to speak --
23      A.  I'm sorry. I have a little laryngitis.
24  I'm getting over a cold.
25      Q.  Since your husband passed away, you have
```

Page 28

```
 1  been identified as the substitute for him in these
 2  lawsuits.
 3      A.  Correct.
 4      Q.  And I assume others not -- beyond what I'm
 5  involved in. Tell me about the process of your
 6  becoming a substitute. What -- are you
 7  the -- strike that.
 8          Did Mr. Harrington have a will or a trust?
 9      A.  Yes.
10      Q.  Which one, if you know?
11      A.  A will.
12      Q.  Are you the trustee -- or excuse me, are
13  you the -- I think they call them personal
14  representatives these days.
15      A.  Yes, I am.
16      Q.  And you are the personal representative?
17      A.  (Nods head.)
18      Q.  So you had -- did you have to go through a
19  process in order to be approved by the court as --
20      A.  Yes.
21      Q.  -- as his personal representative?
22      A.  Uh-huh.
23      Q.  And you were issued papers --
24      A.  Yeah, a letter of testamentary.
25      Q.  Right. So you got that?
```

Page 29

```
 1      A.  Uh-huh.
 2      Q.  And it's on that basis, I assume, that
 3  you've been named, to the best of your knowledge.
 4  This is not technically important here, I just want
 5  to get a feel for what happened. It was on that
 6  basis that you applied to be the substitute --
 7      A.  Yes.
 8      Q.  -- party in these lawsuits?
 9      A.  Uh-huh.
10      Q.  Now, having been named the substitute
11  party in these lawsuits, I don't know what the date
12  was, but maybe approximately six months ago --
13      A.  14th.
14      Q.  That's the date --
15      A.  That's what's on the letter of
16  testamentary.
17      Q.  So that's a little over seven months ago.
18  You have become the party in a number of lawsuits
19  that had existed --
20      A.  Right.
21      Q.  -- prior to Mr. Harrington's death?
22      A.  Correct.
23      Q.  Do you have any idea how many?
24      A.  No.
25      Q.  Do you keep records?
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ADL ICAL, LLC, et. al,

fs,

v.  Case No. 1:22-cv-00072-KG-LF

MAUREEN HARRINGTON,

    Defendant/Counterclaim Plaintiff
    Third Party Plaintiff.

**EXHIBIT "A"**

DEPOSITION OF MAUREEN HARRINGTON
Volume 2
October 20, 2023
9:04 a.m.
201 Third Street, Northwest, Suite 1630
Albuquerque, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: JEFFREY L. SQUIRES
    Attorney for the Plaintiffs

REPORTED BY: Robin A. Brazil, RPR, NM CCR #154
    Bean & Associates, Inc.
    Professional Court Reporting Service
    201 Third Street, Northwest, Suite 1630
    Albuquerque, New Mexico 87102

(8648N) RAB

**272**

1    MR. DeSOUZA: Why don't you take a five-,
2 ten-minute break and then go for 20 minutes, 15
3 minutes.
4    MR. SQUIRES: Sure.
5    MR. DeSOUZA: It's a little closer to your
6 lunchtime, and the downtime for me won't be as bad
7 for you, because you'll be on lunch.
8    MR. SQUIRES: At 12:15 our time, which
9 would be 2:15 your time, we'll take a lunch break.
10   (Recess was taken from 11:40 to 11:54.)
11   Q. (By Mr. Squires) Ms. Harrington, I want to
12 talk about the case against Deepak Dugar.
13   A. Okay.
14   Q. We refer to it as Dugar. You know that
15 Dugar is a small corporate entity that is the
16 business entity through which Deepak Dugar has a
17 surgical practice. What do you know about your
18 claim against Dugar?
19   A. His website used one of Blaine's photos.
20   Q. Okay. Do you know anything about the
21 circumstances of the use of -- Dugar's use of the
22 photo in question?
23   A. Huh-uh. No.
24        (Exhibit 104 marked.)
25   Q. Well, to start with, the document on top

**273**

1 is the demand letter. See that? Ask that be marked
2 as 104.
3        This demand letter is like the other
4 demand letters, and the draft complaint attached to
5 it would apply equally to this, correct?
6   A. Correct.
7        (Exhibit 105 marked.)
8   Q.    ·xt document after that is a letter
9 dated J       3th, 2022, from a lawyer, a law firm,
10 the T          , PC, and that'll be number 105.
11                 this before?
12   ...   ...  I don't recall seeing this,
13 ·?.
14  Q. Would you --
15  A. I would have remembered.
16  Q. Would you skim just the first page?
17  A. Okay.
18  Q. And then on the second -- the third page,
19 really, but it's the second page of text, because
20 the page number two is just a chart.
21  A. Uh-huh.
22  Q. And on the third page it says: Please
23 provide the requested licensing process and fee
24 information for the image in question.
25     Do you see that?

**274**

1   A. Uh-huh.
2   Q. Do you know whether Copycat Legal ever
3 responded to that letter by providing the requested
4 information?
5   A. I don't know.
6   Q. Do you think it was reasonable for the
7 lawyer in question, the Tech Law Group, PC, Jonathan
8 Paul, to request information about the licensing
9 process and fee information with respect to that
10 photograph?
11  A. Yes.
12       (Exhibit 106 marked.)
13  Q. Next is the complaint which would be
14 Number 106. Some of the same questions. Look at
15 page three. Has a copy of the photograph in
16 question -- do you know whether that photograph has
17 ever been the subject of a claim by Mr. Harrington
18 that a user infringed his rights by posting it on a
19 web or Facebook page?
20  A. Yes.
21  Q. It has been, right?
22  A. Yeah. Uh-huh. This was the photo in
23 question, right, that he used the skyline?
24  Q. That's right. So do you think that the --
25 the amount that Mr. Harrington charged or agreed to

**275**

1 settle a claim for in the past for the use of that
2 photograph under similar circumstances for a
3 Facebook of a local business would be a relevant
4 factor in determining what a fair price to be paid
5 to avoid a lawsuit or -- would be?
6   A. Could you repeat that? Which probably
7 not.
8   Q. Do you think that the price paid by
9 another user for a similar purpose who had been
10 challenged by Mr. Harrington would be a relevant
11 factor to consider in determining what a fair price
12 would be?
13  A. Yes.
14  Q. Okay. But you know that people under the
15 circumstances of all of these cases that we're
16 talking about who received such demands, who were
17 sent those demands, are paying at least in part just
18 to avoid the costs of litigation, right?
19  A. Assuming.
20  Q. You would do that, you said, correct?
21  A. Yeah, I would.
22  Q. Paragraph 19 of the complaint: Upon
23 information and belief, Defendant located a copy of
24 the work on the internet.
25  A. 19, you said?

**276**

1  Q. ou have no knowledge as to whether
2  Dugar f... ..ograph, right?
3
4  ...ag... ..21 says: Indeed, Defendant's
5  respo... , through counsel, to Plaintiff's presuit
6  efforts to resolve this matter was for Defendant to
7  demand that Plaintiff pay it one dollar and one cent
8  as a result of Defendant's infringement.
9      Do you know of your own knowledge, who
10  made the demand that Plaintiff, that's -- that was
11  your husband, now you -- pay it one dollar and one
12  cent --
13  A. .
14      . . f Defendant's
15
16  A. .
17  Q. o you know if that's an accurate
18  statement?
19  A. No.
20  Q. Paragraph 28 says: Defendant's
21  infringement was willful.
22      You have no knowledge of any facts that
23  indicate that Defendant willfully infringed a
24  copyright; do you?
25  A. I don't.

**277**

1  Q. I think that's all for that.
2  A. Okay.
3  Q. 28, Defendant's willful -- excuse me.
4  Other than your contention that you lost some income
5  as a result of the alleged infringement, you don't
6  have any other claim that you've been damaged,
7  right?
8  A. No.
9  Q. And you don't know how much income you
10  lost, right?
11  A. Correct.
12  Q. Do you know how you would go about
13  calculating any income you claim to have lost?
14  A. Me personally?
15      MR. DeSOUZA: You're breaking up again.
16  Q. Do you know how you would go about
17  calculating any income you claim to have lost?
18  A. Well, I'd have to find out how much the
19  photo was worth, you know, the price of selling it,
20  and then how long it was up. But I personally would
21  have to ask, like, maybe other photographers or
22  someone to help me with that.
23  Q. This is something that is outside your own
24  knowledge, right?
25  A. Yes.

**278**

1      (Exhibit 107 marked.)
2  Q. I'm going to show you a document marked
3  Exhibit 107. This is Defendant Deepak Dugar's
4  Answers -- Defendant Affirmative Answers and
5  Counterclaims. Looks like this.
6  A. Yeah, okay.
7  Q. Have you seen this before?
8  A. Yes. Yeah, when I was doing my review for
9  here.
10  Q. Okay. And you -- did you read it?
11  A. Not all the way, as thorough as I should.
12  Q. So do you know what affirmative defenses
13  and counterclaims were asserted?
14  A. No. Is that it?
15  Q. Do you know -- yeah, with respect to that
16  document specifics, do you know generally what
17  Defendants in these suits, Defendants accused of
18  copyright infringement, are saying, alleging in that
19  these lawsuits about the reasons they should not be
20  held responsible for infringing copyrights?
21  A. Do I -- do I understand their --
22  Q. What the Defendants are saying.
23  A. Yeah, that they didn't know that it was a
24  copyrighted photo.
25  Q. Right. And you've testified you don't

**279**

1  have any knowledge about whether or not they had
2  knowledge, right?
3  A. Right.
4  Q. But they've all raised something called
5  misuse of copyright?
6  A. Uh-huh.
7  Q. Do you know what that is all about?
8  A. No.
9      MR. DeSOUZA: Jeff, I don't know if that's
10  where you want to stop or ask one or two more. I
11  have to jump on to the next Zoom, because it starts
12  in five minutes.
13      MR. SQUIRES: Let's stop. You need at
14  least two minutes to clear your head.
15      MR. DeSOUZA: Let's reassemble -- it's now
16  ten after 12:00. Do you want to reassemble at five
17  to the hour, same 45 minutes you had yesterday?
18      MR. SQUIRES: I can do less. Let's say
19  2:45 your time, Dan. Will you be clear by then?
20      MR. DeSOUZA: I'll be clear. I'll come
21  back on here as soon as the hearing's done, so I'll
22  just be bobbing around doing other work until
23  whenever you guys come back.
24      (Recess was taken from 12:11 to 12:45.)
25  Q. (By Mr. Squires) The next document I'd ask